Are you ready to proceed? I am, Your Honor. You may. May it please the Court, to uphold Kelly Liu's convictions in this case will require a subtle but very significant increase in the scope of insider trading laws of the United States, all of which are judge-made. The Court will be required to stretch the definition of materiality as handed down by the United States Supreme Court in the basic decision to reach internal corporate rumors that contain neither the actual nature of the transaction, nor the timing of the transaction, nor the ultimate terms of the transaction. And so this Court will be, in effect, saying you can be a mid-level line staff employee and hear corporate rumors and be prosecuted for insider trading based on those rumors alone. Didn't the judge charge that a rumor passed on by an insider had more importance? Yes, he did. And a rumor passed on by an insider can have more importance. It can, unquestionably. Under a line of cases following basic, there's no question but that if an insider, with other added facts that give that rumor specificity and reliability, that can constitute insider information. But what we're missing in this case, Your Honor, is the reliability and the specificity required by law. You didn't object to the jury charge, did you? No, no, Your Honor, the jury charge was not objected to. The law governs the case, right? That's correct. The law governs the case. That's correct. The jury charges are not an issue before the Court right now. It's actually the level of the government's proof. Out of the 34 witnesses called by the government, only three, Meredith Guidry, Rebecca Wallace, and James McMahon, offered any evidence on the very critical issue, on the threshold issue, of whether Kelly Liu was in possession of material non-public information. Others, like Brian Ferraioli, the CFO, or Craig Pierce, they could speculate about what Kelly Liu might have known, but they could not say. In fact, Brian Ferraioli specifically said, I don't know what Kelly Liu knew. Were there rumors within Shaw at the time of the buyout? Absolutely. That something was in the works unquestionably. Was Kelly Liu aware of those rumors? Certainly. That's what she told the FBI. We heard the talk in Shaw. That's what she told the FBI when she was interviewed by them. But the case law is clear, starting with BASIC and moving through Cusimano and an entire line of cases, that rumors within a company cannot alone constitute material information. The Supreme Court defined material information as information in BASIC that a reasonable investor would view as significantly altering the total mix of information available. Now, here's the catch to that. I mean, part of the relevant material information is just that there would be a merger. Correct? No, that's not correct, Your Honor. The rumors were that there was a transaction pending. What she's charged with is having given a tip to her boyfriend that the companies would merge. That's what she's charged with, but that's not what the evidence showed. Okay. I thought, is it correct or is it not correct that the government put witnesses on that said she was present when there were conversations about the upcoming merger? She was present when there were conversations, but where I'm questioning, Your Honor, is the term merger. Because they didn't know, and Rebecca Wallace, McMahon, and Guidry all testified. I don't remember a tremendous amount of details at this point. This is Rebecca Wallace. But I know that there was a deal going on. What do you mean by a deal? A deal, a merger, an acquisition, a transaction. Later, Rebecca Wallace. A merger, an acquisition, you know, call it what you want, but some type of deal involving Shaw. And the reason I'm stressing that point is because it makes a huge difference. The government's own expert, Dr. Becker, who worked for the Securities and Exchange Commission, said whether the company is a target or whether the company is the acquiring company makes a huge difference. If a company is a target, the price of the stock, on average, goes up 20% at the time of the acquisition. If the company is an acquiring company, the price of the stock goes down 1%. So a reasonable investor would want to know what's the deal. And nobody ever knew. What's the case that says that distinction itself can negate whether or not it's material information? I don't know that there is a case. What the closest would come in the form of Cusimano, but then you would also have the three cases we cited in our brief. You would have the— Those are district court opinions, right? Those three cases were district court opinions. So the challenge here is a properly instructed jury made the inferences, and I don't see a circuit case that reverses a jury verdict, having made the inferences of materiality and specificity. I don't see one either, Your Honor, but I also don't see a circuit case that expands all we have as rumors. Right. But if it's an expansion argument, that's really an attack on the jury instruction, isn't it? No, I think it's an attack on the sufficiency, Your Honor, because under a properly—under a proper definition—and the jury was given a definition. I know that they struggled because this was the first insider trading case or one of the—the Shaw Group presented the first insider trading prosecutions in the Fifth Circuit in a considerable amount of time. And they were struggling with how do we define materiality and how do we convey these concepts to a jury, and how do we convey to a jury that this is what they need to find beyond a reasonable— This—sorry. Okay. Who was struggling? You said they were struggling? Who's they? The court. Oh, the parties, I think, were struggling with the proper definition back and forth, the prosecution and the defense. But ultimately, there was no objection to the jury instruction. That's correct, Your Honor. All right. I don't quite understand why investors wouldn't be interested in either a buyout or a merger. I mean, there might be a different level of interest, but surely investors would be interested in either one of those. And I think the state had—the government had economists who said that. They would—an investor would absolutely be interested in the fact that something was going on. But the reasonable investor, and that's the standard, would be absolutely interested in whether Shaw Group, which was constantly in play— there was evidence at trial that Shaw had been the subject of, I think, four or five previous potential acquisitions by another company. And as Rebecca Wallace testified, Shaw was constantly in play. It was constantly buying small companies. It was acquiring things. Things were constantly in motion at Shaw, and everybody at Shaw knew that. The reasonable investor would have wanted to know, well, is Shaw buying or selling? Well, sure, they would have wanted to know as much as they could. But if they had a little nugget, that means they wouldn't go down and go to their broker. And if they said, well, you know, something's happening at Shaw, what does that mean? If you're a reasonable investor, do you go buy options? No, because you don't know whether Shaw's going to be bought or sold. And if Shaw's going to be buying, the price of the stock's going to go down and your options are worthless. And that's— The explanation as to just rumors that are of no value could, at least from the jury's standpoint, be— they could infer from the flurry of calls and buys and the simultaneity of all that, that it's not just coincidence about immateriality. This is a valuable piece of information, and then the buys, right? But there's no proof, and that's where the problem is. You have this— You don't have the content of the conversations, but they just offered that there were a huge number of internal calls. Same thing with the IP address. That's just a lot of coincidence that the jury may not have believed. There is a lot of coincidence, but the problem with these cases and the problem with every insider trading case is that we're always constructing them in hindsight. What we do is we take the fact of the trade, and then we look back. And the question and the distinction that the courts make is, the cases are built with hindsight. The question is whether the cases are built on hindsight. It is very easy, if somebody buys a lottery ticket and they win, to look back retroactively and say, look, that was inevitable, even though at the time they bought the ticket, the odds were 1 in 250 million or whatever. And so what were the dangers of looking back and using these conversations and the timing of the conversations, is that we can construct retroactively scenarios that make people look guilty, and it distracts us from the critical questions of what was known at that time, how did they convey it, and was it material. Wasn't there direct evidence that the CFO testified that he told Rebecca Wallace, Lou's boss, that this was going to be a sale, and then Guidry said that Wallace told her and she believed Lou was with her when she conveyed that information to them? There was that testimony, Your Honor. The problem is it objectively could not have happened. Meredith Guidry, you have to go back to the timeline. This deal with Chicago Bridge and Iron did not come into existence until July 4th. Everything prior to that was Toshiba, and every executive who testified on the point said that the Toshiba-CBNI deal fell apart somewhere near the end of June. So your answer to that question is Guidry's statement is incredible as a matter of law? That's correct, and I'll tell you why. Because what Guidry testified was, oh, there were discussions that started in March and April. No, because the first overture from Toshiba and CBI came on May 2nd. Well, wasn't this just kind of an alteration of the deal? I mean, I think the deal at Chicago Bridge and Iron was in the deal from the very beginning, and Toshiba dropped out, but I think the buy-and-sell agreement referred back to that original agreement. So wasn't this just a continuation of that first deal after all? No, actually it wasn't because it required different terms of financing, and it required it was different parties and there was going to be different operations. It was a new deal from the perspective of bankers, from the perspective of lawyers, and from the perspective of investors. In fact, what tells you that it was a new deal is that, as it turns out, CB&I apparently didn't have enough money to close the deal and was requiring cash, an input of cash from Shaw Group to even complete the transaction. Most of the people internally at Shaw didn't believe the deal was going to go through. Brian Ferraioli wasn't even in town the weekend, who's the chief financial officer, the weekend the deal was ultimately consummated. And so what we have here is, is there a lot of coincidence? Is there a lot of simultaneity, telephone calls, things of that nature? Can you retroactively construct a fairly persuasive argument that there was something going on here? Sure. But that's why the cases compel us to look at what people said, what they knew at that time, and what Kelly Lou could have conveyed to third parties, assuming that there's any evidence that she actually conveyed it. Both of the co-defendants in this case testified, and that's a factor Cusimano looks to. Well, did the tippies say that they relied to prove materiality? Did the tippies say that they relied on the information provided by the insider? Both of the people in this case said, I didn't get any information from Kelly Lou. Well, your time runs out. Do you have any single best authority that it was reversible or not to sever the two? Or do you want to rest on the brief on that point? My best authority would be Zafiro and McCrae, those two decisions. I think that both of those. You're in a case, what the Supreme Court and the Second Circuit's decisions tell us over and over and over is that in these cases facts matter, that that's what we look to in the analysis. And we look to first what were the facts that would have been material at this time? It's a conspiracy charge. It's all the same nucleus. Absolutely. What were the facts that would have been material at this time in terms of the deal? Well, the facts would have— You're back on materiality. You're not pressing the severance argument at all. We're pressing it as an alternative, but we believe that the materiality argument obviously is the strongest argument. And what it does is it illustrates the need for a severance in this case because the facts, these turn on very, very subtle distinctions in this case. The facts are in a really delicate balance, and when you get to the second part of the basic test, that's where this case falls down for the government because you don't have the probability that this transaction was going to occur, even though you may have the significance of the transaction for the corporation as a whole. And I see that I'm out of time, and I'll— Thank you, counsel. Ms. Jones. Thank you, Your Honor. May it please the Court, and good morning. My name is Tricia Jones, and I represent the United States in this case. The problem with the defendant's sufficiency arguments is that she is ignoring the standard of review here. She asked you to disregard the testimony of Ms. Guidry. She asked you to take as true the defendant's own testimony. She completely overlooks the testimony of more than half a dozen witnesses as to the materiality of the information we're talking about. And she asked you to draw no inferences whatsoever from the extremely suspicious volume and timing of phone calls between the players in this case. When this Court is reviewing a verdict for sufficiency, that's not how it works.  It doesn't ignore the government evidence, and it doesn't refuse to draw reasonable inferences from the evidence. Rather— Are there any jury notes here? Sir? Did the jury send out any notes? Your Honor, the jury did send out notes, but I don't recall what they were. I honestly do not remember what the notes were. Was it a particularized verdict or guilty on all counts? Guilty on all counts, Your Honor. And following up on Judge Davis's comment about the jury being properly charged in this case, materiality was actually not even a real issue at trial. Not one of the defense attorneys mentioned it in the Rule 29 arguments. And Ms. Liu's counsel did not mention materiality in her closing argument. The only defense attorney who mentioned it at all was Mr. Ho's counsel, and he devoted three sentences to it, basically saying there's no evidence that Mr. Ho knew about the date and the price, and our expert says that's enough, and that's an element. That was it. This was not a real issue. And the reason is because the information that Ms. Liu had was clearly material to a reasonable investor. There was testimony from General Counsel D'Onofrio that rumors of a buyout can be material, that negotiations about a buyout are some of the most material information. Your Honor, were you getting ready to ask something? I'm always ready to ask a question, but I'm listening to you also. Shoot. Well, I guess then when it's a 13-day trial, 34 witnesses, at what point would you say that Ms. Liu did have material specific information instead of sort of atmospherics? At what point? Your Honor, I think she had it at the very latest on May 29th when she received the whole company due diligence list from Craig Pierce. That was a 22-page document asking for everything about the company, every line of business, all of that information. Mr. Ferraioli said that is not the kind of information that the company would give out to anyone. It's the kind of information that you give to a buyer of the company. Then her, from the government standpoint, evasive or exculpatory answer to the FBI isn't actually pertinent to when she knew. In other words, she said, oh, I didn't know, and then the rebuttal evidence was, well, you at least knew yesterday or the day before, right? Yes, Your Honor, and I was talking actually about something long before. The day before was the draft document. The jury wouldn't have been able to infer material knowledge from her misstatement to the FBI. Is that fair to say? That's correct, Your Honor. Her misstatement to the FBI, I think, shows her intent, her consciousness of guilt. That's why the lies to the FBI. And the jury heard that she didn't actually get much from this, and they were allowed to draw whatever conclusion adverse to the government or, in other words, But don't let me put words in your mouth. Did the government show that she gained a lot from this scheme? What was her monetary gain? The United States did not show. There was some evidence that she may have had a $2,500 gain from Mr. Ho putting money down on a ski house, and Mr. Ho may not have been introduced. But I confess, Your Honor, that it's not clear that we sufficiently proved that that money wasn't paid back to Mr. Ho. So the personal benefit in this case was in providing a gift to a very close friend, somebody that she vacations with, somebody that she's in business with, has a business relationship with, and, in fact, is going to have a big part in a real estate deal without putting up any money and only putting up sweat equity. So her benefit was in providing something to somebody she's closely related to financially and personally. What about the condo rent for the ski trip? And, Your Honor, that's what I was referring to. Mr. Ho did put that money down, and some of it was paid back. We could not conclusively show that none of it was paid back. At least there's no evidence of it all being paid back, but we couldn't prove that there wasn't cash given or something like that. I think the jury could infer perhaps that there was, and there was a benefit surely in the money being put down, essentially loaned to Ms. Liu for one of her obligations. So there was that financial benefit. So it was enough to show that she benefited the friend? Was it enough to prove the entire case against Liu? Yes, Your Honor. As far as personal benefit, the Supreme Court held in the Salmon case that giving confidential information to a trading relative or friend is a sufficient personal benefit to constitute a breach of a fiduciary duty. Even though she didn't get any benefit from Ho? That's correct, Your Honor. And the defense conceded that in this court, that there was a sufficient personal benefit. Related to that, do you have circuit authority? It clearly is different, as opposing counsel began his argument, that this is a middle-level person who might not have access to information. Most of these cases do seem to be the people with the direct access. Do you have circuit authority where insider trading attaches to a mid-level person who may just be in the flux of it all? Your Honor, I think our best case on that is the Millett case from the Second Circuit, where I'm not exactly sure where in the corporate structure he fell, but he was some sort of employee of AT&T. There was a Wall Street Journal article published that AT&T was perhaps going to be engaged in some sort of deal with another company, although it wasn't clear what. And the defendant in that case had done a feasibility study on a potential buyout of a company that had the same sort of vital statistics as the company mentioned in the Wall Street Journal article. And his boss came into his office and said, I don't want you talking about that Wall Street Journal article, which was odd. From that alone, the defendant concluded this Wall Street Journal article must be correct. He called up his friend. He said, guess what? I believe that the information in the Wall Street Journal article is correct, and I believe that AT&T is going to be attempting to buy out this other company. So the information was the same kind of information we have here, information from work. That's how that full discussion was offered in that case. Here, the slight handicap to the government, maybe overcome by the jury verdict, is no one knew what the content of the conversations were, right? It's just lots of calls happened. That's correct, Your Honor. And then you have—and this is something important as far as Mr. Russo is concerned, and I need to correct something at page 25 of the reply brief. The defendant asserts that the grand jury testimony of Mrs. Russo was offered only as impeachment and therefore cannot be considered as supporting the verdict in this case. But that is not correct. It was specifically offered pursuant to Rule 801D1A of the Federal Rules of Evidence, which allows introduction as substantive evidence of prior testimony given under oath when the declarant is on the stand and can be cross-examined. And at page 1975 of the record, that is exactly how I offered the evidence, as substantive evidence. There was no objection. The issue had been briefed ahead of trial. And it is extremely important because Ms. Russo's testimony was very powerful. Exhibit 45A, which is at tab one of our record excerpts, she describes what information she was given by her son, Sammy, about why he wanted to buy Shaw stock. And this is what she said. There was a rumor at Shaw that they were going to be bought out. Now, it's not just, oh, there's some big transaction. They are going to be bought out. And some other company, Kelly would be working for another company, and this buyout could possibly be beneficial to him buying some stock. And I'm not sure who the company was or what it was, and that's absolutely all that I know. She went on. There was another grand jury excerpt admitted, which is 45C, also at tab one of the record excerpts. And in that excerpt, she describes a conversation she had with Ms. Lu after the investigation began. And Ms. Lu admitted to her that there was a rumor at Shaw that there was going to be a buyout. She passed the rumor on to Sammy, and then Sammy wanted to buy the stock. So this is not just completely vague information, as the defense would have you believe. Additionally, Ms. Lu had substantially more information than just rumors. She had the actual due diligence list for the whole company in her possession as of May 29th of 2012. She knew that the Maggie model was being updated out of cycle in May and in June. She knew, and she was participating in the due diligence process, which according to Mr. Ferraioli was at a frantic pace after July 9th of 2012. She was involved in conversations with investment bankers that used the term the other side, that asked about the financial modeling, and that asked about EBITDA. She participated in conversations with her colleagues who had come to the conclusion that Shaw was being sold. According to Ms. Guidry, she was at a meeting when Rebecca Wallace informed them that the company was going to be sold and that CB&I was the buyer. And let me address the idea of Ms. Guidry's testimony being incredible as a matter of law. I don't see any basis for that. Ms. Guidry testified that in March and April they were called into a meeting, and at that point the information was that Shaw was looking to sell itself and was exploring various different buyers. So she didn't say, oh, I knew all about Toshiba and CB&I back in March and April. She said that there was a meeting that they were looking to sell. And as far as CB&I, the defendant would have you believe that CB&I was not involved in the deal until Ms. Guidry left to go to Georgia. That's not correct. They were involved in the deal from the beginning. Mr. Ray from CB&I is the person who came up with the idea of the transaction. They were involved from beginning to end. So there's no reason to believe that she could not have been informed of CB&I's interest in purchasing Shaw prior to leaving in July. This is just another example of the defense wanting you not to believe the government's evidence. And that's not where we are right now. That would be an argument for the jury. It is not an argument for this court. I would also disagree with the explanation of the law as requiring certain specificity. The basic case does not say that information must be specific. What basic says is that a reasonable investor must find the information to be significant in the decision whether to invest. And basic specifically said that it can be speculative and contingent information. Basic also specifically said there's not any one factor or event that is required before information can be material. It is what is in the mind of a reasonable investor. The basic court went further and said that the only evidence, the only information that's really excluded from the materiality test is essentially useless information. The information that Ms. Liu had was not essentially useless. And as examples of that, consider that Mr. Ho testified that he traded based on a rumor around Morgan City that something big was happening at Shaw. That's it. That led him to buy $8,000 worth of the most risky options available in Shaw. He was the most confident investor in Shaw in the entire world on July 27th of 2012. And yet the defense would have you believe that the information he claimed to rely on, there's something big going to happen at Shaw, is not material. That information is absolutely material. Mr. D'Onofrio, the general counsel of Shaw, testified at trial that negotiations are extremely material, that he notified the board of directors that information regarding the negotiations was material, that he also said that rumors are material. He said that you don't need timing, date, and price. Liu was advised of that too, wasn't she? Didn't she sign an agreement? She acknowledged that mergers were material, non-public information. That was part of her training. It was part of the policy of the company, that negotiations about business combinations are absolutely material, non-public information. Even the defense's expert, Dr. Mason, while he testified on direct, that information without certainty of event, price, and date is useless, on cross-examination he completely capitulated. He said that uncertain information is used all the time to trade. He said that if Kelly Liu had informed Mr. Russo and Mr. Ho that Shaw was about to be sold, that that would be important information for an investor to have. That's the end of the ballgame. That's their own expert. You had our expert who testified that rumors, if published, lead to a 6% increase in the price of the stock, showing that even rumors can be material, non-public information. And, of course, Kelly Liu knew far more than rumors in this case. Further evidence about Mr. Ho possessing material, non-public information about the buyout is the testimony of his own witness, Jack Smith. And this was not mentioned in our brief, but I wanted to point it out to the court. At pages 2929 to 2930, and then at 2934 of the record, Mr. Smith testified that he got a call from Mr. Ho and Mr. Ho told him that he had heard a hot rumor that Shaw was being bought out. He testified also that Mr. Ho told him a big company was going to buy Shaw. So this is not just some vague information. This is information that Ho had that he told his good friend and defense witness, Mr. Smith. Given that, there's no doubt that there was material, non-public information given to Mr. Ho. Your Honors, I think I've covered all of the points I intended to make, and unless you have any further questions, I will rest on my brief. Thank you. Rebuttal. The government just made the statement that Kelly Lou knew far more than rumors. What? She didn't know dates. She didn't know parties. She didn't know transactions. She didn't know the nature of the transaction. She didn't know any of that. The May 29th letter doesn't tell her anything about that because it relates to a deal that fell through. The only information that is relevant in this case to what Kelly Lou knew, in terms of the materiality in this case, has to come after July 4th because that's the new deal. So the May 29th letter, while it was a deep dive, as described, into the financial information of the company, takes the government nowhere. First, it doesn't reveal the names of the parties. Everything is coded, and second, as Rebecca Wallace testified and James McMahon testified, requests for extensive amounts of information were routine at Shaw. Shaw was always in play. What do you say to counsel's argument that this wasn't raised at trial, that these statements, that this information was immaterial? That doesn't bind this court in terms of determining the sufficiency of the evidence. They may not have argued it because I don't think, quite frankly, that they were fully aware of the significance of materiality in this case. The government talks about the basic decision, but they leave out the second half of the analysis. In the Mayhew decision, which both we cite and the government cites, the Second Circuit specifically says, in the context of a merger where information can be speculative and tenuous, the materiality standard may be difficult to apply. Yes, it absolutely is. But then it goes on to say, a violation of the securities laws will not be found when the disclosed information is so general that the recipient thereof is still undertaking a substantial economic risk that his tempting target will prove to be a white elephant. And that's what we were left with here. To respond to your question, Judge Davis, about the real estate, we stipulated in our brief, we conceded, that under Supreme Court jurisprudence a benefit has to be found. The real estate deal never came to fruition, and it was born and died in a couple of phone calls, all of which occurred before any of this happened. So it's a non-issue. The same is absolutely true with the ski trip. There was a spreadsheet in this case introduced into evidence that basically demonstrated that everybody got their money back. This had nothing to do with a payback for inside information. The net economic benefit to Kelly Lou in this case was zero. Not a nickel. Not a nickel. And so what we are looking at is a prosecution of Kelly Lou for potentially discussing rumors with friends who then may have decided to trade on her information, and now she's in prison for it. That's what the court is actually looking at in this case. And to get to that point, we have to stretch the definition of materiality completely beyond recognition. That's where we are. The government testified that six or eight witnesses testified that these things were material. Witnesses shouldn't be testifying about what's material. That's a decision of law for the court. There should have been objections all over the courtroom. The fact that there weren't doesn't change anything. Except... Yes. What you're stuck with. Believe me. I'm painfully aware. The final point is that in Milet, the decision that the government just relied on, the TIPRA was the vice president of labor relations at AT&T, not a line employee in a small division of a company. And he indicated that AT&T was going to be attempting to acquire NCR. That's pretty specific information. It tells you who the target company is, and it tells you what the nature of the transaction is. You can go back through all of the testimony of Mayhew. I'm sorry, not Mayhew. Of Wallace, of McMahon, and of Rebecca Guidry, and you won't find anything with that specificity. Thank you. We'll take the matter under advisement. We'll call the next case.